**Aben E. JOHNSON and Joan G. Johnson, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 01–428T, 03–2803T, 05–1265T.**

United States Court of Federal Claims.

Jan. 9, 2008.

Patrick K. Rode, Troy, MI, for plaintiffs.

George L. Squires, U.S. Department of Justice, Washington, DC, with whom were Richard T. Morrison, Acting Assistant Attorney General and Chief David Gustafson, for defendant.

## OPINION

FIRESTONE, Judge.

This case comes before the court on cross-motions for summary judgment. This is the third motion for summary judgment the court has considered in these consolidated cases, which were filed by the plaintiffs, Aben E. Johnson ("Mr. Johnson") and Joan G. Johnson (collectively, "plaintiffs" or "Johnsons"), in an effort to recover taxes they incurred in relation to losses they suffered as the victims of fraud. In July 2006, the government filed a motion for partial summary judgment in Case No. 03–2803, contending that, as a matter of law, the plaintiffs were not entitled to take a theft loss deduction for any portion of their loss until they had resolved all of their claims for recovery of the stolen money. In *Johnson v. United States,* 74 Fed.Cl. 360 (2006) ("*Johnson I*"), the court granted the government's motion, holding that the plaintiffs could not assert a theft loss deduction in 1998 because they were actively pursuing recovery of their losses from Mr. Hasson at that time and had not *ascertained with reasonable certainty* how much they would recover. *Id.* at 366. The

court concluded that, "while a taxpayer may in the year of discovery take a loss where there is not a 'reasonable prospect of recovery,' if there is a 'reasonable prospect of recovery' the taxpayer must wait to take the theft loss deduction until the recovery process is finalized, either through an adjudication or a settlement, until the taxpayer abandons her collection efforts, or until the claim for reimbursement is resolved in some other way." *Id.* Accordingly, the court determined that, in any year after the year of discovery of the loss, the standard to be applied in evaluating the propriety of a theft loss deduction is whether the amount to be recovered could be ascertained with reasonable certainty in that year.[1]

In their current motion for summary judgment, the plaintiffs contend that they were entitled to a theft loss deduction in 1998, or, in the alternative, in 2001, for the amount of the loss they suffered, arguing that by the end of 1998, or alternatively by the end of 2001, they had determined the maximum amount of the loss they would be able to recover. The plaintiffs seek a theft loss deduction for the amount they contend they determined would never be recovered.

The defendant, the United States ("defendant" or "government"), contends that the plaintiffs were not entitled to a theft loss deduction in either 1998 or 2001 because the plaintiffs' recovery efforts were still ongoing at that time, and therefore the plaintiffs could not have ascertained with reasonable certainty the total amounts that they would recover as a result of their efforts. The government asserts that the plaintiffs were not entitled to a theft loss deduction for any portion of their loss until their recovery efforts were complete and until they knew, with certainty, how much of their loss they would recover. For the reasons set forth below, the plaintiffs' motion is **GRANTED-IN-PART** and **DENIED-IN-PART** and the government's motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

## BACKGROUND

The following facts are taken from the Plaintiffs' Proposed Findings of Uncontroverted Fact and are undisputed unless otherwise noted. Between 1988 and 1997, the plaintiffs were victims of a fraud scheme perpetrated by John Robert ("Jack") Hasson ("Mr. Hasson") and his associates involving gems, jewelry, and collectibles. In 1997, the plaintiffs discovered that they had been victimized by Mr. Hasson and undertook an investigation to determine the extent of their loss and the likelihood of recovery from Mr. Hasson. The total loss suffered by the plaintiffs at the hands of Mr. Hasson as a result of the fraud scheme was $78,160,409.00.[2] Since 1998, the plaintiffs have been involved in litigation against numerous parties in an attempt to recover their losses. Their litigation efforts are summarized below.

### I. The Plaintiffs' 1998 Litigation

On February 11, 1998, Mr. Hasson and two corporations he controlled—Jack Hasson, Inc., doing business as Jewels by Hasson, and Hasson and Sons, Inc.—filed a complaint in the 15th Judicial Circuit Court, Palm Beach County, Florida, asserting a defamation claim against Mr. Johnson. This complaint alleged (among other things) that Mr. Johnson had wrongly stated that Mr. Hasson

---

1. The court also recently considered the government's motion for summary judgment in Case No. 01–428, which was denied on September 27, 2007. *Johnson v. United States*, 79 Fed.Cl. 266 (2007) (*"Johnson II"*). Case No. 01–428 does not deal with a theft loss deduction, but instead deals with capital gains taxes paid by the plaintiffs on income they contend they did not actually receive. In denying the government's motion, the court held that "if the plaintiffs can establish that Mr. Hasson never sold any gems in 1994, but simply paid the plaintiffs from other funds that they had provided Mr. Hasson (in an effort to conceal and advance his fraudulent scheme), the plaintiffs will be able to establish that they did not clearly realize any accession to wealth and were not subject to tax on the amounts received." *Id.* at 271. Case No. 01–428 is currently stayed pending resolution of the parties' cross-motions for summary judgment before the court.

2. The plaintiffs invested a total of $83,587,534.00 in gems and jewelry purchased from Mr. Hasson. In 1998, the value of the gems and jewelry in the plaintiffs' possession was $5,427,125.00. Accordingly, the plaintiffs' net loss was $83,587,534.00 less $5,427,125.00, or $78,160,409.00.

had misrepresented the quality and value of the gems the plaintiffs had purchased from him, that Mr. Hasson had cheated the plaintiffs, and that Mr. Hasson had stolen from the plaintiffs. On April 10, 1998, Mr. Johnson filed an answer, counterclaim and third-party complaint. The counterclaim was asserted against all of the plaintiffs (Mr. Hasson and his two corporations named above). The third-party claim added three third-party defendants: K.T.B., Inc. and International Gem Society, Inc. (additional corporations controlled by Mr. Hasson) and Leopold Woolf. Mr. Woolf was an appraiser whose appraisals were provided to the plaintiffs in connection with their purchase of gems. Extensive discovery was conducted in this case through the end of 1998. Among other things, Mr. Johnson obtained financial records showing the assets owned by Mr. Hasson and entities controlled by him, banking records showing the transactions he and the entities controlled by him performed, and records of litigation Mr. Hasson was or had been involved in, including Mr. Hasson's personal divorce proceedings. All of Mr. Hasson's assets of any significance had been discovered by the end of 1998. During discovery in 1998, it was learned that Mr. Hasson, through various entities he controlled, had taken steps to launder the funds he had obtained by fraud from the plaintiffs.

In particular, Mr. Johnson learned in 1998 that:

a. Between July and September 1997, Mr. Hasson had wire transferred approximately $26,100,000.00 to an account in the name of Malham Enterprises, Ltd. at the National Westminster Bank on the Isle of Man in the United Kingdom;

b. Shortly after each transfer to the Malham account, virtually identical transfers totaling approximately $26,000,000.00 were made from the Malham account to a Smith Barney account in the name of the Joseph C. Stein Trust; and

c. $50,000.00 was transferred from the Malham account to Mr. Hasson's lawyer, Scott Colton;

d. Of the approximately $26,000,000.00 placed in the Joseph C. Stein Trust Smith Barney account, the following transfers were made:

a. $800,000.00 was transferred in January 1998 to an account in the name of Cromwell, Pfaffenberger, Barner, Griffin & Colton, P.A., a law firm in which Scott Colton was a partner and shareholder;

b. $100,000.00 was transferred in June and July 1998 to an account at the Mellon Bank in the name of Boyes & Farina, P.A., a law firm in which John Farina, Scott Colton's lawyer, was a member;

c. Approximately $20,000,000.00 was transferred in July 1998 to a Smith Barney account in the name of the Peter Westbrook Irrevocable Trust, of which Scott Colton was the trustee;

d. $3,700,000.00 was transferred in July 1998 to a Smith Barney account in the name of the Scott Colton Trust, of which Scott Colton was the trustee; and

e. $2,300,000.00 was transferred in July 1998 to a Smith Barney account in the name of the John Farina Trust, of which John Farina was the trustee;

e. Of the approximately $20,000,000.00 placed in the Peter Westbrook Irrevocable Trust Smith Barney account in July 1998, the following transfers were made:

i. $50,000.00 was transferred in July 1998 to a Bank One account in New Orleans, Louisiana in the name of the Peter Westbrook Irrevocable Trust; and

ii. $20,345,031.44 was transferred in December 1998 to an account in the Discount Bank in Paris, France in the name of the Peter Westbrook Irrevocable Trust;

f. $100,000.00 was transferred in July 1998 to the John Farina Trust Smith Barney account from the Scott Colton Trust Smith Barney account;

g. The following transfers were made from the $2,300,000.00 and $100,000.00 previously transferred to the John Farina Trust Smith Barney account:

    i. $787,000.00 was transferred to the Boyes & Farina Mellon Bank account; and

    ii. $250,000.00 was transferred to Ted Klein, another lawyer representing Scott Colton.

In addition, in 1998 Mr. Johnson discovered the assets owned or formerly owned by Mr. Hasson and entities controlled by him, including several parcels of real estate (located in Jupiter, Florida, Breckenridge, Colorado, Big Pine Key, Florida, and Palm Beach Gardens, Florida), a Lockheed Jet Star airplane, several boats, several automobiles, a Harley–Davidson motorcycle dealership and other assets. Finally, the plaintiffs learned in 1998 that Mr. Hasson had transferred $700,000.00 to Lois Robertson, Mr. Hasson's former bookkeeper.

No allegations were made in Mr. Johnson's counterclaim against Jack Hasson, Inc., Hasson and Sons, Inc., K.T.B., Inc. or the International Gem Society, Inc. separate from the allegations made against Mr. Hasson. All of the corporations were used as fronts to defraud Mr. Johnson, and all were considered to be identical with Mr. Hasson for purposes of prosecuting the claim. As a result of their own investigation and the information provided to them by the plaintiffs, federal investigators seized the following assets in the possession of Mr. Hasson and others in December 1998:(1) the Smith Barney brokerage account in the name of the Scott Colton Trust; (2) the Smith Barney brokerage account in the name of the John Farina Trust; and (3) the Mellon Bank account in the name of Boyes & Farina. Furthermore, on November 26, 1998, Mr. Johnson obtained an order from the High Court of Justice of the Isle of Man freezing funds held there in the name of Malham Enterprises, Ltd. In addition, pursuant to a request for mutual legal assistance from the United States, a Paris Discount Bank account in the name of Heloneti Galera, trustee of the Peter Westbrook Irrevocable Trust, was frozen by the government of France on December 15, 1998. Finally, by agreement of counsel, $250,000.00 in an account of Ted Klein, an attorney, was placed in escrow in December 1998 pending the outcome of the litigation.

According to the plaintiffs, their investigation in 1998 demonstrated that the maximum net assets available for recovery on the claims against Mr. Hasson and his enterprises were worth $45,240,386.00 in late 1998, including all of the assets identified above. The plaintiffs assert, however, that they did not have a reasonable prospect of recovering the full $45,240,386.00 in net assets, due to Mr. Hasson's efforts to launder funds and anticipated difficulties in recovering funds that were in accounts in foreign countries. Accordingly, as of December 31, 1998, the plaintiffs contend that they had a reasonable likelihood of recovering only $19,919,718.00 on their claims against Mr. Hasson and his associates, even if they prevailed in full.

## A. Resolution of the Plaintiffs' Claims Against Mr. Hasson

On March 28, 2000, the Plaintiffs obtained a default judgment against K.T.B., Inc. and International Gem Society, Inc. On July 17, 2000, the Plaintiffs obtained a default judgment against Mr. Hasson, Jack Hasson, Inc. and Hasson and Sons, Inc. The plaintiffs' default final judgments against Mr. Hasson totaled $233,198,433.00. On December 6, 2000, a writ of garnishment was issued to First Union National Bank requiring it to disclose any indebtedness to Hasson and Sons, Inc., among others. In response, First Union disclosed it was indebted to Hasson and Sons in the amount of $735.64. On February 8, 2001, the court entered a judgment ordering First Union to pay $735.64 to Mr. Johnson, and payment was made on March 28, 2001. In March 2005, Mr. Johnson's attorney was informed that the proceeds of a class action settlement in which Mr. Hasson was a claimant had been paid to an account at Wachovia Bank. On March 5, 2005, a writ of garnishment was issued to Wachovia Bank requiring it to disclose any indebtedness to Mr. Hasson. In response, Wachovia disclosed it was indebted to "Jack Hasson Agency" in the amount of $18,050.60. On June 22, 2005, the court entered a judg-

ment ordering Wachovia to pay $18,050.60 to Mr. Johnson, and payment was made on July 7, 2005.

## B. Resolution of the Plaintiffs' Claims Against Mr. Woolf

Through discovery in 1998, the plaintiffs learned that Mr. Woolf was retired and was suffering from end-stage renal failure. He owned two homes, but they were held jointly with his wife, so they were not subject to execution. In November 1998, Mr. Woolf made an offer of judgment to Mr. Johnson in the amount of $10,000.00, which Mr. Johnson did not accept. On January 26, 1999, Mr. Woolf's attorney moved to withdraw because Mr. Woolf could not afford to pay him. An order granting that motion was entered on February 17, 1999. Mr. Woolf represented himself for the remainder of the litigation. On February 6, 2001, Mr. Woolf entered into a settlement agreement with the plaintiffs under which Mr. Woolf paid $25,000.00 to settle the claim against him. An order dismissing that claim was entered on February 22, 2001.

## II. Criminal Proceedings Against Mr. Hasson

On April 10, 1999, a federal criminal complaint was issued against Mr. Hasson, and he was arrested on April 12, 1999. He has remained incarcerated since his arrest. On April 20, 1999, Mr. Hasson was indicted in the United States District Court for the Southern District of Florida ("U.S. District Court") for wire fraud, mail fraud, money laundering and other charges. James A. Speiser, a former employee of Mr. Hasson, was also indicted. A superseding indictment was issued in May 1999, and Clifford Sloan, another former employee of Mr. Hasson, was added as a criminal defendant. As part of the indictment, the United States included a forfeiture claim against Mr. Hasson's assets, including several of the assets identified above. On June 10, 1999, the United States Attorney fielded a bill of particulars designating a number of Mr. Hasson's assets for forfeiture, including the assets identified above.

Mr. Hasson's attorneys filed a motion on June 11, 1999 seeking authorization to use the assets identified in the indictment and bill of particulars for the payment of Mr. Hasson's attorney fees. In its response, the government indicated that Mr. Hasson had already sold a number of the assets, including a Lockheed Jetstar airplane for just under $2,000,000.00, a lot located in Big Pine Key, Florida for $425,324.00, a 110' Broward yacht for $3,500,000.00, a 70' Jim Smith yacht for an unknown amount, and a 65' Jim Smith yacht for $1,839,700.00. The government also indicated that Mr. Hasson was actively attempting to sell another lot in Big Pine Key, Florida, a home in Palm Beach Gardens, Florida, and a ranch in Martin County, Florida. Finally, the government indicated that Mr. Hasson had recently gifted several assets to his estranged wife Suzanne, including a ranch in Jupiter, FL, a ski chalet in Breckenridge, Colorado, a 1995 Porsche automobile, a 1998 Volvo automobile, a 1997 Ford Explorer automobile, and a 1998 Coachman motorhome.

In an order entered on August 18, 1999, pursuant to a stipulation between the U.S. Attorney and Mr. Hasson's criminal defense attorneys, Mr. Hasson was authorized to use certain assets identified in the government's bill of particulars for the payment of his attorneys' fees. In the stipulation, Mr. Hasson's attorneys' fees were estimated at $1,750,000.00. On February 25, 2000, a jury returned a guilty verdict against Mr. Hasson on four of the six counts in the indictment. On June 8, 2000, Mr. Hasson was sentenced to forty years' imprisonment and was ordered to pay restitution to the plaintiffs in the amount of $78,408,691.00. Pursuant to orders of forfeiture, the ranch lots, the ski property in Breckenridge, and the real estate in Big Pine Key were sold by the U.S. Marshal, and the proceeds were deposited into the registry of the U.S. District Court.

On May 29, 2001, the United States moved the U.S. District Court to enter a final judgment in Mr. Hasson's criminal case and to issue an order providing for the restoration of forfeited funds to Mr. Johnson and other victims. In its motion, the United States stated:

The United States has determined that the known assets of the convicted criminal defendant [Mr. Hasson] are insufficient to satisfy the $78,408,691.00 order of restitution entered in this case. Although the estimated amount of forfeited assets will be insufficient to make the victims whole in this case, the United States ... intends to make the forfeited property available for restitution to the victim of the criminal activity in this case.

Pls.' Ex. 48 at 7. On June 8, 2001, the U.S. District Court entered a Final Judgment and Order Providing for Restoration of Victims, which ordered that most of the assets held in the registry be paid to the plaintiffs. Pls.' Ex. 34 at 6. After delays due to Mr. Hasson's appeal of his conviction and other challenges to the court's findings, on February 13, 2004, the U.S. District Court entered an order authorizing the release of forfeited funds to the plaintiffs. Pls.' Ex. 125. On February 17, 2004, $13,976,605.63 was paid to the plaintiffs by the clerk of the court. These funds constituted the plaintiffs' share of the funds seized by the federal government from the Scott Colton Trust, the John Farina Trust, Boyes & Farina, Ted Klein, the proceeds from the sale of the ranch lots, the proceeds from the sale of the Breckenridge lots, the proceeds from the sale of the Big Pine Key lot, the proceeds of the sale of Treasure Coast, and an account with Bear Stearns in the name of Reading Management.

## III. The Plaintiffs' Claims Initiated in 1999

On May 5, 1999, Johnson filed an amended counterclaim and third-party complaint in the Hasson civil case. The amended pleading added forty-one new third-party defendants.[3] The new defendants against whom Mr. Johnson asserted claims, other than the entities controlled by Mr. Hasson, were persons who were transferees of assets from Mr. Hasson or were involved in the attempt to launder the fraud proceeds after the fraud was committed. The claims against these defendants sought the recovery of funds transferred to them by Mr. Hasson for which they were not good faith transferees for value. Although Mr. Johnson asserted broad claims against these defendants, the plaintiffs contend that Mr. Johnson could only recover from these defendants what they received, directly or indirectly, from Mr. Hasson, and even then only to the extent they were not good faith transferees for value.

### A. Claim Against Jack Hasson as Trustee of the Jack Hasson Revocable Trust

The Jack Hasson Revocable Trust was a trust of which Mr. Hasson and/or his nominees were the principals and beneficiaries. Mr. Johnson's sole allegation against the Jack Hasson Revocable Trust was that it was the owner of real estate in Florida and Colorado purchased with the proceeds of the fraud committed against the plaintiffs. A default judgment was entered against the Jack Hasson Revocable Trust on January 11, 2001.

### B. Claim Against Treasure Coast Harley–Davidson, Inc.

Treasure Coast Harley–Davidson, Inc. ("Treasure Coast") was a corporation formed

---

3. The following were added as third-party defendants on May 5, 1999: Gem Appraiser's Laboratory, Scott Colton in his individual capacity, Scott Colton as Trustee of the Scott Colton Trust, Scott Colton as Trustee of the J.A.S. Irrevocable Trust, Scott Colton as Trustee of the Irene Lois Robertson Trust, Scott Colton as Trustee of the Joseph C. Stein Trust, Cromwell, Pfaffenberger, Barner, Griffin & Colton, P.A., John Farina in his individual capacity, John Farina as Trustee of the John Farina Trust, Boyes & Farina, P.A., Malham Enterprises, Ltd., Peter Westbrook in his individual capacity, Peter Westbrook as Trustee of the Joseph C. Stein Trust, Heloneti Galera, Heloneti Galera as Trustee of the Peter Westbrook Irrevocable Trust, Treasure Coast Harley–Davidson, Inc., Blake of P.B., Inc., Jack Hasson as Trustee of the Jack Hasson Revocable Trust, Jack Hasson as Trustee of the Blake Hasson Trust, Jack Hasson as Trustee of the Tiffany Hasson Trust, Jack Hasson as Trustee of the Kyle Hasson Trust, Jack Hasson as Trustee of the Kimaree Hasson Trust, Jack Hasson as Trustee of the Ryan Hasson Trust, Blake Hasson, Tiffany Hasson, Kyle Hasson, John Hasson, Kimaree Hasson, Ryan Hasson, Diamond H Ranch, Inc., Irene Lois Robertson, James Speiser, Diamond Emerald Isle, Inc., Chianti's PBG, Inc., Harry Speiser, Clifford Sloan, Robert Hinton, Sean O'Neill, Suzanne Hopkins, Mark Russell Hopkins, Sally Ann Hopkins, and Gem Appraiser's Laboratory. The individual claims against each of these parties will be discussed in further detail below.

in 1998 that was controlled by Mr. Hasson. It was formed in connection with Mr. Hasson's purchase of a Harley–Davidson motorcycle dealership. The sole allegation against Treasure Coast was that it was purchased with the proceeds of the fraud committed against the plaintiffs. Mr. Hasson's interest in Treasure Coast was sold in 1999 for $3,245,179.11. Pursuant to a stipulation between the U.S. Attorney and Mr. Hasson's criminal defense attorneys, proceeds from the sale of Treasure Coast in excess of $2,200,000.00 were designated for the payment of Mr. Hasson's attorneys. Proceeds in the amount of $2,365,536.93 were eventually deposited in the registry of the U.S. District Court. That amount was eventually forfeited by the government in the criminal proceeding against Mr. Hasson and included in the amount awarded to the plaintiffs by the U.S. District Court. A default judgment was entered against Treasure Coast on June 11, 2000. On December 6, 2000, a writ of garnishment was issued to First Union National Bank requiring it to disclose any indebtedness to Treasure Coast, among others. In response, First Union disclosed it was indebted to Treasure Coast in the amount of $26,158.00. On February 8, 2001, the court entered a judgment ordering First Union to pay the $26,158.00 to Mr. Johnson, and payment was made on March 28, 2001.

## C. Claim Against Blake of P.B., Inc.

Blake of P.B., Inc. ("Blake") was a corporation formed in 1985 that was controlled by Mr. Hasson. The sole allegation against Blake was that boats held in its name were purchased with the proceeds of the fraud committed against the plaintiffs. A default judgment was entered against Blake on July 17, 2000. On August 2, 2000, a writ of execution was issued against assets of Blake, among others. On August 24, 2000, a 17' Mako boat belonging to Blake was seized pursuant to that writ. On October 17, 2000, the boat was sold at auction, and Mr. Johnson bid in $7,100.00 of his judgment against Blake which, net of expenses of the sale of $1,409.61, reduced Mr. Johnson's judgment claim by $5,690.39.

## D. Claim Against Diamond H Ranch, Inc.

Diamond H Ranch, Inc. was a corporation formed in 1995 that was controlled by Mr. Hasson. No other specific allegations were made against Diamond H Ranch, Inc. in the Amended Counterclaim. A default judgment was entered against Diamond H Ranch, Inc. on November 15, 2000. No funds were ever collected from Diamond H Ranch, Inc.

## E. Claim Against Heloneti Galera and the Peter Westbrook Irrevocable Trust

Heloneti Galera was a fictitious individual created by Mr. Hasson and the Peter Westbrook Irrevocable Trust was a sham trust created by Mr. Hasson, of which Heloneti Galera was the named trustee. The sole allegation against Heloneti Galera and the Peter Westbrook Irrevocable Trust was that they were used by Mr. Hasson in the attempt to launder $26,100,000.00 through the Isle of Man to Paris, France. A partial summary judgment as to Count IX (Constructive Trust) was entered against Heloneti Galera and the Peter Westbrook Irrevocable Trust on November 22, 1999. The remaining claims against Heloneti Galera and the Peter Westbrook Irrevocable Trust were dismissed on July 21, 2000. On July 4, 2002, the Paris Tribunal of First Instance entered a judgment ordering restitution to the plaintiffs of the funds in the Paris Discount Bank in the name of Heloneti Galera and the Peter Westbrook Irrevocable Trust. On November 16, 2005, after all appeals had been exhausted, $20,346,361.71 was transferred from the Paris Discount Bank to the plaintiffs, together with $500,000.00 in fees awarded by the court.

## F. Claim Against Peter Westbrook and the Joseph C. Stein Trust

Peter Westbrook was a fictitious individual created by Mr. Hasson and the Joseph C. Stein Trust was a sham trust created by Mr. Hasson, of which the fictitious Peter Westbrook was the trustee and of which Mr. Hasson was the initial beneficiary and Peter Westbrook was the subsequent beneficiary. The sole allegation against Peter Westbrook

and the Joseph C. Stein Trust was that his name was used by Mr. Hasson in the attempt to launder $26,100,000.00 through the Isle of Man. An order dismissing Peter Westbrook individually and as trustee of the Joseph C. Stein Trust was entered on July 21, 2000.

### G. Claim Against Malham Enterprises, Ltd.

Malham Enterprises, Ltd. ("Malham") was an Isle of Man company controlled by Mr. Hasson. The sole allegation against Malham was that it was used by Mr. Hasson in the attempt to launder $26,100,000.00 through the Isle of Man. In November 1998, Malham's bank account in the Isle of Man was frozen. A default judgment was entered in the Hasson case against Malham on March 22, 2000. On June 20, 2000, the plaintiffs' attorneys in the Isle of Man received £17,-327.15 from the bank account in Malham's name, which is equivalent to $25,476.16.[4]

### H. Claims Against Jack Hasson as Trustee of the Blake Hasson Trust, the Tiffany Hasson Trust, the Kyle Hasson Trust, the Kimaree Hasson Trust, and the Ryan Hasson Trust

The Blake Hasson Trust, Tiffany Hasson Trust, Kyle Hasson Trust, Kimaree Hasson Trust, and Ryan Hasson Trust were trusts created by Mr. Hasson for his children and of which Mr. Hasson was the trustee. The sole allegations against the children's trusts were that they were used by Mr. Hasson to launder funds and that they received funds from Mr. Hasson that were stolen from the plaintiffs. On February 27, 2001, Mr. Johnson filed an impleader claim against the Hasson children's trusts, as described more particularly *infra*. Other than the assets pursued in the impleader claim, no other assets derived from the fraud on the plaintiffs were found in the possession of the children's trusts established on their behalf, so no other collection efforts were undertaken against the trusts. The claims against the Kimaree Hasson Trust, Tiffany Hasson Trust, Blake Hasson Trust, Kyle Hasson

Trust and Ryan Hasson Trust were dismissed on October 1, 2003.

### I. Claim Against Scott Colton and the Scott Colton Trust

Scott Colton was an attorney in North Palm Beach, Florida. He created the Peter Westbrook Irrevocable Trust and the Joseph C. Stein Trust, both of which were shams, for use in laundering funds. He also purchased Malham Enterprises, Ltd. for use in laundering funds. The Scott Colton Trust was a trust of which Mr. Colton was the trustee. Mr. Colton assisted Mr. Hasson in his attempt to launder $26,100,000.00 and he was the recipient of funds obtained from the plaintiffs through fraud. From July through September 1997, Mr. Colton assisted Mr. Hasson in transferring approximately $26,100,000.00 to the Isle of Man and transferring approximately $26,000,000.00 back to the Joseph C. Stein Trust, as described *supra*. $50,000.00 was also transferred from the Isle of Man directly to Mr. Colton. Upon being subpoenaed to testify in the Hasson case, Mr. Colton engineered the transfer of $20,000,000.00 from the Joseph C. Stein Trust to the Peter Westbrook Irrevocable Trust. He also arranged the transfer of approximately $3,700,000.00 to the Scott Colton Trust and approximately $2,300,000.00 to the John Farina Trust from the Joseph C. Stein Trust. Mr. Colton also engineered the transfer of $775,000.00 of the $26,100,000.00 to Mr. Hasson. Finally, Mr. Colton engineered the transfer of the approximately $20,000,000.00 in the Peter Westbrook Irrevocable Trust to the Paris Discount Bank in France. On or about December 14, 1998, the federal government seized the assets, totaling $3,427,411.43, of the Scott Colton Trust. On November 29, 1999, a federal criminal information was filed against Scott Colton. The contents of the account of the Scott Colton Trust were also identified for forfeiture in that information. Mr. Colton pled guilty to the information. The amount recovered from Mr. Colton by way of seizure was less than the amount forfeited and was less than the amount included in the plaintiffs'

---

4. Of the £17,327.15 received, £9,570 was paid to the plaintiffs' attorneys and £7,757.15 was remitted to the plaintiffs. The plaintiffs received $11,405.34, which represents an exchange rate of £1 = $1.47. At the same conversion rate, £17,327.15 = $25,476.16.

net asset analysis performed in 1998. Thus, Mr. Johnson continued to prosecute the claim against Mr. Colton in the Hasson civil case. On September 22, 2000, Mr. Colton voluntarily remitted $75,000.00 to the plaintiffs. Mr. Johnson and Mr. Colton reached a settlement on May 14, 2003, under which Mr. Colton paid Mr. Johnson an additional $28,000.00, and the claim against Mr. Colton was dismissed.

### J. Claim Against the J.A.S. Irrevocable Trust

The J.A.S. Irrevocable Trust was a trust created by Mr. Colton and of which Mr. Colton was the trustee. James Speiser was the nominal beneficiary of the trust. The sole allegation against the J.A.S. Irrevocable Trust was that it was used by Mr. Hasson as a conduit for the transfer of funds fraudulently obtained from the plaintiffs. In 1997, at least $750,000.00 was transferred by Mr. Hasson to the J.A.S. Irrevocable Trust. Of that amount, $350,000.00 was transferred to Diamond Emerald Isle, Inc. to be used by James Speiser to purchase a bar, and $250,000.00 was transferred to an attorney representing James Speiser for use by Chianti's PBG, Inc. to purchase a restaurant. The claim against the J.A.S. Irrevocable Trust was dismissed as part of the settlement with Mr. Colton referred to above.

### K. Claim Against the Irene Lois Robertson Trust

The Irene Lois Robertson Trust was a trust of which Colton was a trustee. The sole allegation against the Irene Lois Robertson Trust was that it was the recipient of $700,000.00 fraudulently obtained from the plaintiffs. The claim against the Irene Lois Robertson Trust was abandoned in April 2000 when it was not included in the Second Amended Answer, Counterclaim and Third–Party Complaint. The claim was replaced by the claim against the Pascal D. Robertson and Irene Lois Robertson Revocable Living Trust, discussed below.

### L. Claim Against Cromwell, Pfaffenberger, Barner, Griffin & Colton, P.A.

Cromwell, Pfaffenberger, Barner, Griffin & Colton, P.A. ("Cromwell") was a law firm in which Mr. Colton was a partner. The claims against Cromwell were based on a theory of vicarious liability for the actions of Mr. Colton and on the fact that its trust account was used by Mr. Colton to help launder $800,000.00 fraudulently obtained from the plaintiffs. The $800,000.00 transferred to the Cromwell trust account was derived from the $26,000,000.00 transferred to the Joseph C. Stein Trust Account, which in turn came from the $26,100,000.00 funneled through the Isle of Man. Mr. Johnson and Cromwell reached a settlement on April 16, 2001, under which Cromwell paid Mr. Johnson $285,000.00, and the claim against Cromwell was dismissed.

### M. Claims Against John Farina, the John Farina Trust, and Boyes & Farina, P.A.

John Farina was an attorney in West Palm Beach, Florida. The claims against Mr. Farina were based on the assertions that he had assisted Mr. Hasson in the attempt to launder $26,100,000.00 and that he was the recipient of funds fraudulently obtained from the plaintiffs. The John Farina Trust was a trust of which Mr. Farina was the trustee. On July 7, 1998, $2,300,000.00 was transferred to the John Farina Trust from the Joseph C. Stein Trust. Boyes & Farina, P.A., was a law firm of which Mr. Farina was a member. $100,000.00 was transferred to Boyes & Farina from the Joseph C. Stein Trust. $1,113,000.00 was transferred to Boyes & Farina from the John Farina Trust. From that money, $250,000.00 was transferred to Ted Klein, a criminal defense attorney representing Mr. Colton. The federal government seized $1,310,713.72 in assets from the John Farina Trust. The $250,000.00 in the account of Mr. Klein was held in escrow by agreement of counsel pending the outcome of the Hasson litigation, and was subsequently seized by the federal government. On or about December 14, 1998, $745,524.74 in funds held by Boyes & Farina were also seized by the federal government. The amounts held by Mr. Farina and Mr. Klein were forfeited by the government in the Hasson criminal proceeding.

The amount recovered from Mr. Farina by way of seizure was less than the amount forfeited and was less than the amount included in the plaintiffs' 1998 net asset analysis. Thus, Mr. Johnson continued to prosecute the claim against Mr. Farina in the Hasson case. The plaintiffs calculated that the difference between the amount received by Mr. Farina derived from funds obtained from the plaintiffs by fraud and the amount actually seized was $233,325.31, after a deduction of fees actually earned by Mr. Farina. Proceedings were stayed against Mr. Farina for a substantial period of time due to the insolvency of Boyes & Farina's malpractice carrier. Farina, the Farina Trust and Boyes & Farina reached a settlement with the plaintiffs on August 30, 2004, under which Mr. Farina paid Mr. Johnson $50,000.00, and the claims were dismissed.

### N. Claims Against James Speiser, Diamond Emerald Isle, Inc., and Chianti's PBG, Inc.

James Speiser was a former employee of Mr. Hasson. He was the nominal beneficiary of the J.A.S. Irrevocable Trust. One allegation against Mr. Speiser was that he helped organize an elaborate charade to convince Mr. Johnson that the Sultan of Brunei, one of the world's richest persons, was interested in buying the gems the plaintiffs had purchased. Mr. Speiser also was alleged to have been a participant in Mr. Hasson's money-laundering activities. In 1997, the J.A.S. Irrevocable Trust received at least $750,000.00 from Mr. Hasson. Diamond Emerald Isle, Inc. was a corporation owned by Mr. Speiser. It was alleged that $350,000.00 was transferred from the J.A.S. Irrevocable Trust to Diamond Emerald Isle, Inc. for the purchase of a bar. Chianti's PBG, Inc. was a corporation owned by Mr. Speiser. It was alleged that $250,000.00 was transferred from the J.A.S. Irrevocable Trust to an attorney representing Mr. Speiser for Chianti's PBG, Inc. for the purchase of a restaurant. The plaintiffs conducted an asset search of Mr. Speiser in November 1998, which revealed limited assets in his name. Mr. Speiser was indicted on April 20, 1999 and pled guilty, and on June 15, 2000 was sentenced to eighteen

months' imprisonment and ordered to pay the plaintiffs $50,000,000.00 in restitution.

On July 14, 2000, the plaintiffs registered the criminal judgment against Mr. Speiser with the Palm Beach County Circuit Court and commenced execution proceedings. Two assets were seized in execution: real property located at 241 Cortez Road, West Palm Beach, Florida and a 16' 7" Boston Whaler boat. The plaintiffs purchased the 241 Cortez Road property at a Sheriff's auction on January 3, 2001 and subsequently sold the property on March 23, 2001 for $105,761.63. After payment of the mortgage and closing costs, the plaintiffs received net proceeds of $45,016.32. The boat was not sold by the Sheriff, as Boston Whaler Financial Services had a priority secured interest in the property, and the boat was surrendered to the financing company. No further assets were available for collection, and no collection efforts were undertaken after 2001. An order dismissing the plaintiffs' claim against Mr. Speiser was entered on November 5, 2002.

The plaintiffs' investigators conducted an investigation of Diamond Emerald Isle, Inc. and Chianti's PBG, Inc. in November 1998. The bar, restaurant and the corporations were found to be of no significant value. Default judgments were entered against Diamond Emerald Isle, Inc. and Chianti's PBG, Inc. on November 2, 2000.

### O. Claim Against Harry Speiser

Harry Speiser was James Speiser's brother. The sole allegation against Harry Speiser was that he participated in the Sultan of Brunei charade described above. Harry Speiser's role in the charade was not known until 1999. An asset search was conducted on Harry Speiser on October 2, 1998. He was also questioned concerning his assets at his deposition on November 10, 1998. It appeared he had only nominal, non-exempt assets. Mr. Johnson and Harry Speiser entered into a settlement agreement on August 6, 1999, under which Harry Speiser paid Mr. Johnson $10,000.00, the amount he had received from Mr. Hasson, and the plaintiffs' claim against him was dismissed.

**P. Claims Against Blake Hasson, Tiffany Hasson, Kyle Hasson, John Hasson, Kimaree Hasson and Ryan Hasson**

Blake Hasson, Tiffany Hasson, Kyle Hasson, John Hasson, Kimaree Hasson and Ryan Hasson were Mr. Hasson's children. The sole allegation against the children was that they received funds from Mr. Hasson that were stolen from the plaintiffs. All of the children except Kimaree Hasson were minors. A separate impleader claim was commenced against Kimaree Hasson on December 11, 2000. That claim was based on the receipt by her of $12,500.00 from the sale of an automobile owned by Mr. Hasson and is described below. Mr. Johnson entered a settlement agreement with Kimaree Hasson on July 27, 2001, under which Kimaree Hasson paid the Plaintiffs $5,000.00, and the claim against her was dismissed on August 13, 2001. No other assets derived from the fraud against the plaintiffs were found in the possession of the Hasson children, so no other collection efforts were undertaken against the children after 2001. The claims against Blake Hasson and Tiffany Hasson were voluntarily dismissed on August 22, 2003. The claims against Kyle Hasson, John Hasson and Ryan Hasson were abandoned in 2001. An order dismissing the claims against them was inadvertently not entered.

**Q. Claim Against Clifford Sloan**

Clifford Sloan was a former employee of Mr. Hasson. The allegations against Mr. Sloan were that he attempted to influence the testimony of a witness and that he may have received stolen funds from Mr. Hasson. Mr. Sloan was indicted in May 1999. The criminal claims against him were that he helped to forge some signatures, testified falsely at a deposition, helped to cash a check during the money-laundering activities and attempted to influence the testimony of a witness. Mr. Sloan was acquitted in the trial in the Hasson criminal case.

Mr. Sloan was deposed in August 1998. He testified that he had come out of retirement to work for Mr. Hasson and was paid $600 per week by Mr. Hasson. He did not appear to have any collectible assets. No collection efforts were ever undertaken against Mr. Sloan. The cost of obtaining a judgment and then trying to collect on it was judged to outweigh any possible recovery. The claim against Mr. Sloan was voluntarily dismissed on August 22, 2003.

**R. Claim Against Robert Hinton**

Robert Hinton was a former employee of Mr. Hasson who assisted Mr. Hasson in defrauding the plaintiffs. In the Second Amended Counterclaim filed by the plaintiffs in 2000, they alleged that Mr. Hinton had received extensive non-salary payments from Mr. Hasson. An asset search was conducted on Mr. Hinton on December 9, 1998, which revealed that Mr. Hinton was essentially judgment-proof. He owned a few vehicles of low value and a home held in joint name that was not subject to execution. No collection efforts were ever undertaken against Mr. Hinton as the cost of obtaining a judgment and then trying to collect on it was judged to outweigh any possible recovery. The plaintiffs' claim against Mr. Hinton was voluntarily dismissed on December 17, 2002.

**S. Claim Against Sean O'Neill**

Sean O'Neill was an employee of Mr. Hasson. The sole allegation against Mr. O'Neill was that he impersonated a bodyguard in the Sultan of Brunei charade described above. Mr. O'Neill's role in the charade was not known until 1999. After interviewing Mr. O'Neill on May 26, 1999, it was determined he had no quality knowledge in the matter such that a claim could be pursued against him. The claim against Mr. O'Neill was dismissed on June 16, 1999.

**T. Claim Against Irene Lois Robertson**

Irene Lois Robertson was Mr. Hasson's former bookkeeper. The sole claim against Ms. Robertson was that she received $700,000.00 in stolen funds from Mr. Hasson. In 1999, after the amended counterclaim was filed, the plaintiffs discovered additional transfers to Ms. Robertson. In the Second Amended Counterclaim, the plaintiffs' claim against Ms. Robertson was that she had received over $1,000,000.00 in non-salary payments from Mr. Hasson. On November 8,

2000, Mr. Johnson filed an impleader claim against Ms. Robertson, as described more particularly *supra*. On May 17, 2001, Mr. Johnson entered into a settlement with Ms. Robertson in which she stipulated to a judgment in the amount of $825,000.00, which included the $700,000.00 transfer alleged in the Amended Counterclaim. The settlement was to be funded out of a Merrill Lynch trust account and four parcels of real estate purchased with part of the proceeds received by Ms. Robertson from Mr. Hasson. In connection with the settlement, the plaintiffs received a total of $649,801.32 from Ms. Robertson, directly or indirectly, as follows:

1. $212,877.00 received on June 12, 2001 from a Merrill Lynch account controlled by Ms. Robertson;

2. $207,438.45 received on July 21, 2001 from an annuity controlled by Ms. Robertson;

3. $141,132.88 received on November 30, 2001 from the sale of two of the lots referred to in the settlement;

4. $84,704.67 received on July 19, 2002 from the sale of the other two lots referred to in the settlement;

5. $2,303.72 received in October 2002 from the sale of two vehicles owned by Ms. Robertson; and

6. $1,344.60 received between November 1, 2002 and May 22, 2003 from garnishments of Ms. Robertson's bank account and wages.

## U.  Claim Against Suzanne Hopkins

Suzanne Hopkins, also known as Suzanne Hasson, was Mr. Hasson's wife. The claims against Ms. Hopkins were that she had received real property and an unknown amount of cash, believed to total approximately $1,000,000.00, from Mr. Hasson that was the product of the theft from the plaintiffs. The real property consisted of property in Jupiter, Florida, Breckenridge, Colorado, and Palm Beach Gardens, Florida. The cash transferred to Ms. Hopkins came from the proceeds from the sale of a yacht controlled

5. The following were added as third-party defendants on April 28, 2000: Pascal Robertson, Pascal & Irene Robertson Trust, Barbara Hasson, Sharon Eaton, Sondra Pillion, Avraham Tal, Lu-

by Mr. Hasson and titled in the name of Blake. On March 15, 2001, Johnson filed an impleader claim against Ms. Hopkins, as described more particularly *infra*. No assets derived from the fraud on the plaintiffs were found in the possession of Ms. Hopkins other than the funds sought through the impleader, so no other collection efforts were undertaken against Ms. Hopkins after 2001.

## V.  Claim Against Mark Russell Hopkins and Sally Ann Hopkins

Mark Russell Hopkins was Suzanne Hopkins' brother and Mr. Hasson's brother-in-law. Sally Ann Hopkins was Mark Russell Hopkins' wife. The sole allegation against Mark Russell Hopkins and Sally Ann Hopkins was that they were the transferees of a ranch lot from Mr. Hasson. That lot was seized by the federal government and sold, and the proceeds were included in the distribution made to the plaintiffs by the U.S. District Court. The plaintiffs' claim against Mark Russell Hopkins and Sally Ann Hopkins was voluntarily dismissed on January 29, 2001.

## W.  Claim against Gem Appraiser's Laboratory, Ltd.

Gem Appraiser's Laboratory, Ltd. was a corporation that was dissolved in 1995 and had been controlled by Leopold Woolf. The sole allegation against Gem Appraiser's Laboratory was that it was vicariously liable for Mr. Woolf's actions. The claim against Gem Appraiser's Laboratory was dismissed as part of the settlement with Mr. Woolf described *supra*.

## IV.  The Plaintiffs' Claims Initiated in 2000

On April 28, 2000, Johnson filed a second amended counterclaim and third-party complaint in the Hasson case. The amended pleading added fifteen third-party defendants, the claims against each of which will be discussed in more detail below.[5]

ther Jeffries, Reading Management, Atlantic Recreation, Norbert Gartmann, Aaron Patrick, Mindy Romer, William Stuart Cross, William Stuart Cross, P.A., and Doumar, Allsworth, Curtis,

### A. Claim Against Pascal D. Robertson, and Irene Lois Robertson and Pascal D. Robertson as Co–Trustees of the Irene Lois Robertson and Pascal D. Robertson Revocable Living Trust

Pascal D. Robertson was Irene Lois Robertson's husband. Mr. Johnson also filed an impleader claim against Pascal Robertson on November 17, 2001, as described *infra.* The Irene Lois Robertson and Pascal D. Robertson Revocable Living Trust ("Robertson Trust") was a trust of which Irene Lois Robertson and Pascal D. Robertson were co-trustees and which was used by them in connection with the receipt of funds from Mr. Hasson that were stolen from the plaintiffs. Mr. Johnson also filed an impleader claim against Irene Lois Robertson and Pascal D. Robertson as trustees of the Robertson Trust on November 8, 2001, as described *infra.* The sole claim against Pascal Robertson and the Robertson Trust was that they were the recipients or beneficiaries of the transfer of funds to Irene Lois Robertson. The claim was identical to the claim asserted individually against Irene Lois Robertson. The claim against Pascal Robertson and the Robertson Trust was settled on May 17, 2001 as part of the settlement with Irene Lois Robertson described *supra.*

### B. Claim Against Barbara Hasson

Barbara Hasson was Mr. Hasson's sister, and she assisted Hasson in concealing and liquidating assets. The sole allegation against Ms. Hasson was that she assisted Mr. Hasson in liquidating his assets after his arrest. No allegation was made that identified any assets she received from Mr. Hasson that were derived from the fraud on the plaintiffs. No collection efforts were ever undertaken against Ms. Hasson as the cost of obtaining a judgment and then trying to collect on it was judged to outweigh any possible recovery. The claim against Ms. Hasson was voluntarily dismissed by the plaintiffs on April 28, 2002.

Cross, Laystrom, Perloff, Voight, Wachs & Ma-

### C. Claim Against Sharon Eaton

Sharon Eaton was a Palm Beach County resident who was paid by Mr. Hasson to participate in the Sultan of Brunei charade described above. An asset search was conducted on Ms. Eaton in 1998, but it revealed no significant collectible assets. The plaintiffs subsequently learned that Eaton had recently gone through bankruptcy. At her deposition in 1998, Ms. Eaton pled the Fifth Amendment and Mr. Johnson was unable to learn about her role in the charade and whether she had been paid. At the Hasson criminal trial in 2000, she testified that she had been paid $12,000.00 by Mr. Hasson for participating in the charade. Mr. Johnson settled with Ms. Eaton on May 8, 2001, and she paid the plaintiffs $12,000.00, which was the amount she received from Mr. Hasson.

### D. Claim Against Sondra Pillion

Sondra Pillion was a licensed notary public in Florida. The sole claim against Ms. Pillion was that she notarized fake signatures in connection with transferring funds to France. The claim against Ms. Pillion was voluntarily dismissed by the plaintiffs on January 29, 2001.

### E. Claim Against Avraham Tal

Avraham Tal was a resident of Paris, who was also known as Avi Herson. Mr. Tal helped launder the funds obtained from the plaintiffs that were deposited in the Discount Bank in Paris. Mr. Tal asserted a right to the funds held in the Discount Bank. Mr. Tal also filed a collusive suit against Mr. Hasson in Miami, Florida, for non-payment for gems allegedly purchased by Mr. Hasson from Mr. Tal. The suit attributed Hasson's non-payment to the freezing of the funds held in the Discount Bank. The Paris Court of First Instance convicted Mr. Tal of fraud in connection with the transfer of funds obtained from the plaintiffs to the Discount Bank and ordered the funds released to Mr. Johnson. A default judgment was entered against Mr. Tal in the Hasson civil case on October 16, 2000, but no money was ever collected from Mr. Tal.

cIver.

### F. Claim Against Luther Jeffries

Luther Jeffries was a resident of Martin County, Florida, who allegedly assisted Mr. Hasson in laundering funds stolen from the plaintiffs by helping to transfer $6,324,000.00 to the Bahamas. Mr. Jeffries was paid $110,000.00 out of those funds, which he used to buy a cabin in Alaska. The funds transferred to the Bahamas, which were the source of the payment to Mr. Jeffries, were derived from the sale by Mr. Hasson of his Jetstar jet aircraft, a parcel of real estate on Big Pine Key, and three boats as described above. On August 21, 2000, Mr. Johnson filed an impleader claim against Mr. Jeffries, as described more particularly below. Mr. Johnson entered a settlement agreement with Mr. Jeffries on May 9, 2001, under which Mr. Jeffries paid the plaintiffs $82,000.00.

### G. Claim Against Reading Management Ltd.

Reading Management Ltd. was a Bahamian Company used by Mr. Hasson to launder funds stolen from the plaintiffs. Of the $6,324,000.00 transferred by Mr. Hasson to the Bahamas, $2,500,000.00 was subsequently transferred to an account in the name of Reading Management Ltd. at Bear Stearns Securities Corp. The funds transferred to the Bahamas were derived from the sale by Mr. Hasson of his Jetstar jet aircraft, a parcel of real estate on Big Pine Key, and three boats. Funds in the amount of $2,607,521.15 in the Reading Management Bear Stearns account were seized by the federal government in the Hasson criminal case and forfeited to the government. Mr. Johnson voluntarily dismissed the claim against Reading Management on May 14, 2001. The funds seized from Reading Management were included in the amount awarded to the plaintiffs by the U.S. District Court on February 17, 2004.

### H. Claim Against Atlantic Recreation, Ltd.

Atlantic Recreation, Ltd. was British Virgin Islands company formed in 1997 by Mr. Hasson. It was under the control of Mr. Hasson and was used to launder the funds stolen from the plaintiffs. The claim against Atlantic Recreation was that Mr. Hasson had registered his 110' yacht with Atlantic Recreation under a new name in an effort to hide the asset. The boat had been acquired by Mr. Hasson with funds stolen from the plaintiffs. The 110' yacht was sold by Mr. Hasson and the proceeds were part of the funds transferred to the Bahamas. A default judgment was entered against Atlantic Recreation on August 3, 2000, but no funds were recovered from Atlantic Recreation.

### I. Claim Against Norbert Gartmann

Norbert Gartmann was a Swiss national who lived in the French Riviera. He allowed his address and telephone number to be used to set up the accounts at the Paris Discount Bank and at Smith Barney in Florida in the name of the fictional Heloneti Galera and Peter Westbrook. Mr. Gartmann received $50,000.00 from the $26,000,000.00 laundered through the Isle of Man and to the Paris Discount Bank. The plaintiffs' claim against Mr. Gartmann was settled on June 26, 2001 with Mr. Gartmann paying $4,800.00 to the plaintiffs, which net of fees provided the plaintiffs with $4,783.20.

### J. Claim Against Aaron Patrick

Aaron Patrick was the general manager of Treasure Coast, Mr. Hasson's motorcycle dealership. Following the sale of the dealership, $100,500.00 of the proceeds was transferred to Mr. Patrick purportedly in payment of an antecedent debt. The claim against Mr. Patrick was for the funds transferred to him contrary to orders entered by the U.S. District Court in the Hasson criminal case, which had forfeited the proceeds of the sale of the dealership to the government and had only authorized the payment of legitimate closing costs. The claim against Mr. Patrick was voluntarily dismissed on September 26, 2000. On December 1, 2000, Mr. Johnson filed an impleader claim against Mr. Patrick, as is more particularly described *infra*.

### K. Claim Against Mindy Romer

Mindy Romer was Mr. Hasson's former wife. Mr. Hasson and Ms. Romer were divorced in 1994. Only a small portion of the funds Mr. Hasson obtained from the plain-

tiffs by fraud and theft had been paid to Mr. Hasson by that time. The claim against Ms. Romer expressly disclaimed an interest in the marital assets of Ms. Romer and Mr. Hasson, which did not constitute assets obtained from the plaintiffs as a matter of law. However, Ms. Romer was seeking to recover additional funds in post-divorce proceedings and was asserting claims against the funds seized and forfeited by the federal government in the Hasson criminal proceeding. The claim asserted by the plaintiffs against Ms. Romer merely sought to assert Mr. Johnson's superior claim to the additional funds Ms. Romer was seeking. No claim was ever made against assets in Ms. Romer's possession, so no collection efforts were undertaken against Ms. Romer. The claim against Ms. Romer was voluntarily dismissed on August 22, 2003.

### L. Claims Against William Stuart Cross, William Stuart Cross, P.A., and Doumar, Allsworth, Curtis, Cross, Laystrom, Perloff, Voight, Wachs & MacIver

William Stuart Cross was an attorney in Broward County, Florida who represented Mr. Hasson in the sale of Treasure Coast. William Stuart Cross, P.A. was a professional association in which Mr. Cross was a principal. Doumar, Allsworth, Curtis, Cross, Laystrom, Perloff, Voight, Wachs & MacIver was a professional association, in which Mr. Cross was a principal, that received the proceeds of the sale of Treasure Coast. The claims against these defendants were based on the fact that Mr. Cross had diverted proceeds from the sale of Treasure Coast, contrary to the order of the U.S. District Court, which required that proceeds from the sale, after payment of closing costs, were to be applied to the payment of Mr. Hasson's criminal defense attorneys, in part, with the remainder to be deposited with the court as part of the forfeiture proceedings. The claims against these defendants were voluntarily dismissed without prejudice on July 28, 2000. On February 6, 2001, an impleader action was commenced against these defendants, as is described below.

## V. The Impleader Claims Filed by the Plaintiffs in 2000 and 2001

### A. Impleader of Luther Jeffries and Ruth Teichert

On August 21, 2000, an order was entered impleading Luther Jeffries and ordering him to show cause why the $110,000.00 transferred to Mr. Jeffries by Mr. Hasson should not be subject to execution by Mr. Johnson. Ruth Teichert was the wife of Mr. Jeffries. On October 30, 2000, an order was entered impleading Ms. Teichert and ordering her to show cause why the $110,000.00 transferred to Mr. Jeffries by Mr. Hasson should not be subject to execution by Mr. Johnson. The funds transferred by Mr. Hasson to the Bahamas, which were the source of the payment to Mr. Jeffries, were derived from the sale by Mr. Hasson of his Jetstar jet aircraft, a parcel of real estate on Big Pine Key, and three boats. The impleader claims against Mr. Jeffries and Ms. Teichert were dismissed as part of the settlement with Mr. Jeffries described above.

### B. Impleader of Sharon Eaton

On September 19, 2000, an order was entered impleading Sharon Eaton and ordering her to show cause why the $12,000.00 paid to her by Mr. Hasson should not be subject to execution by Mr. Johnson. Ms. Eaton was already a defendant in the Hasson case. The impleader claim against Ms. Eaton was dismissed as part of the settlement with Ms. Eaton described above.

### C. Impleader of Irene Lois Robertson, Pascal D. Robertson, Irene Lois Robertson and Pascal D. Robertson as Co–Trustees of the Robertson Trust, Chet Weinbaum, and Atterbury, Goldberger & Richardson, P.A.

In November 2000, an order was entered impleading Irene Lois Robertson and Pascal D. Robinson, individually and as co-trustees of the Robertson Trust, Chet Weinbaum, and Atterbury, Goldberger & Richardson, P.A., and ordering them to show cause why the funds received by them, directly or indirectly, from Mr. Hasson should not be subject to execution by Mr. Johnson. Chet Weinbaum

was an attorney who represented the Robertsons and the Robertson Trust. The claim against him was for legal fees paid to him by the Robertsons out of the funds derived from fraud. Atterbury, Goldberger & Richardson, P.A. was a law firm that represented the Robertsons and the Robertson Trust. The claim against it was for legal fees paid to it by the Robertsons out of the funds derived from fraud. The impleader claims against the Robertsons and the Robertson Trust were dismissed as part of the settlement with the Robertsons described above. The impleader claim against Mr. Weinbaum was settled on July 17, 2001, and under that settlement the plaintiffs received $12,000.00 from Mr. Weinbaum. The impleader claim against Atterbury, Goldberger & Richardson, P.A. was settled on June 1, 2001, and under that settlement the plaintiffs received $32,000.00 from Atterbury, Goldberger & Richardson, P.A.

### D. Impleader of Aaron Patrick

On December 1, 2000, an order was entered impleading Aaron Patrick, ordering him to show cause why the $100,500.00 paid to him out of the proceeds of the sale of Treasure Coast should not be subject to execution by Mr. Johnson. Mr. Patrick was a defendant in the Hasson case, but the claim against him was voluntarily dismissed. The impleader claim against Mr. Patrick was settled on August 14, 2001, and under that settlement the plaintiffs received $25,000.00 from Mr. Patrick.

### E. Impleader of Cynthia Lehman and Kimaree Hasson

On December 11, 2000, an order was entered impleading Cynthia Lehman and Kimaree Hasson, ordering them to show cause why the $12,500.00 paid to them out of the proceeds of the sale of a Chevy Astro Van owned by Mr. Hasson should not be subject to execution by Mr. Johnson. Cynthia Lehman was a former girlfriend of Mr. Hasson. She had taken possession of a Chevy Astro Van owned by Mr. Hasson and subsequently sold the vehicle for $12,500.00. The impleader claim against Ms. Lehman was settled on July 2, 2001, and under that settlement the

plaintiffs received $5,000.00 from Ms. Lehman. The impleader claim against Kimaree Hasson was dismissed as part of the settlement with Ms. Hasson described above.

### F. Impleader of William Stuart Cross and William Stuart Cross, P.A.

On February 6, 2001, an order was entered impleading William Stuart Cross and William Stuart Cross, P.A. ordering them to show cause why the proceeds from the sale of Treasure Coast he had diverted contrary to the order of the U.S. District Court in the Hasson criminal case should not be subject to execution by Mr. Johnson. On October 31, 2001, a magistrate judge entered an Order and Report and Recommendation that Mr. Cross be held in contempt for improperly diverting funds from the sale of Treasure Coast. In that order, the magistrate judge found that $258,283.57 had been improperly diverted. Of that sum, $88,261.47 was owed to Mr. Hasson's criminal attorneys. The remainder, $170,022.10, was to be paid into the U.S. District Court registry. The impleader claims asserted against these defendants and the contempt proceedings were settled on April 16, 2002, and under that settlement the plaintiffs received $50,000.00 from these defendants.

### G. Impleader of Suzanne Hopkins

On March 15, 2001, an order was entered impleading Suzanne Hopkins ordering her to show cause why the $900,000.00 she received from the proceeds of the sale of a yacht belonging to Mr. Hasson should not be subject to execution by Mr. Johnson. A trial was held on the claims against Ms. Hopkins, and on November 18, 2004, a judgment in the amount of $900,000.00 was entered against her. In collecting on the judgment, the plaintiffs received a total of $475,143.22 from Ms. Hopkins, directly or indirectly, as follows:

1. $5,500.00 received on December 9, 2004 from the sale of a Subaru automobile owned by Suzanne Hopkins;

2. $90,031.01 received (net of taxes) in 2005 and 2006 from a GE annuity owned by Suzanne Hopkins;

3. $55,239.83 received from a "College of Illinois" account for the benefit of Suzanne Hopkins' children;

4. $90,436.22 received (net of taxes) in 2005 and 2006 from a Zurich annuity owned by Suzanne Hopkins; and

5. $233,936.16 received net of expenses and closing costs from the sale of a home in Illinois owned by Suzanne Hopkins.

### H. Impleader of Jack Hasson as Trustee of the Blake Hasson Trust, the Tiffany Hasson Trust, the Kyle Hasson Trust, the Kimaree Hasson Trust, and the Ryan Hasson Trust

On March 15, 2001, an order was entered impleading Mr. Hasson as trustee of the Blake Hasson Trust, the Tiffany Hasson Trust, the Kyle Hasson Trust, the Kimaree Hasson Trust, and the Ryan Hasson Trust, ordering him to show cause why Hartford Life Insurance Company annuities purchased by Mr. Hasson and placed in those trusts should not be subject to execution by Mr. Johnson. The existence and value of the annuities were not discovered until 2000. On July 12, 2001, an amended default judgment *nunc pro tunc* was entered against Mr. Hasson as trustee of the Kyle Hasson Trust and the Ryan Hasson Trust, which ordered payment of 100 percent of the net value of the annuities held by those trusts to Mr. Johnson. On August 14, 2001, $54,736.42, the total value of the annuities, was paid to the plaintiffs from the proceeds of the annuities held by the Kyle Hasson Trust and the Ryan Hasson Trust. On October 12, 2001, summary judgment was entered against Mr. Hasson as trustee of the Blake Hasson Trust, the Tiffany Hasson Trust and the Kimaree Hasson Trust, which ordered payment of $6,397.00 from each of the annuities held by those trusts to the plaintiffs. On November 13, 2001, $19,191.00 was paid to the plaintiffs from the annuities held by the Blake Hasson Trust, the Tiffany Hasson Trust and the Kimaree Hasson Trust. No other assets were found in the possession of the children's trusts that was derived from the fraud on the plaintiffs.

### I. Impleader of Robert Hinton

On March 29, 2001, an order was entered impleading Robert Hinton ordering him to show cause why the $218,346.92 in non-salary payments he received from Treasure Coast should not be subject to execution by Mr. Johnson. The impleader proceeding against Mr. Hinton was dismissed on December 17, 2002 with the dismissal of the direct claim against him, as described above.

### J. Proposed Impleader of the North Palm Beach Aquatic Foundation

In 1999, the plaintiffs discovered that, on February 5, 1998, Mr. Colton had caused $5,000.00 to be transferred from an account in the name of the Joseph C. Stein Trust to the North Palm Beach Aquatic Foundation ("Foundation"). The $5,000.00 was derived from the $800,000.00 transferred to the account of Mr. Colton's law firm as described above. When notified that the $5,000.00 were the proceeds of fraud, counsel for the Foundation moved to deposit the funds in the registry of the Palm Beach Circuit Court. On August 11, 2000, counsel for the plaintiffs gave notice to counsel for the Foundation of their intention to seek to implead the Foundation if it did not agree to release the funds to the plaintiffs. On September 14, 2000, an order was entered allowing the release of the funds to the plaintiffs. After deduction of a processing fee by the court clerk, the plaintiffs received a payment of $4,945.00.

### K. Proposed Impleader of Darla Simons

In 1999, the plaintiffs discovered that, on February 5, 1998, Mr. Colton had caused $5,000.00 to be transferred from an account in the name of the Joseph C. Stein Trust to Darla Simons. The $5,000.00 was derived from the $800,000.00 transferred to the account of Mr. Colton's law firm as described above. When notified that the $5,000.00 were the proceeds of fraud, counsel for Ms. Simons agreed to hold the funds pending further order of the court. On August 11, 2000, counsel for the plaintiffs gave notice to counsel for Ms. Simons of their intention to seek to implead Ms. Simons if she did not agree to release the funds to the plaintiffs.

On October 24, 2000, Ms. Simons voluntarily remitted the $5,000.00 to the plaintiffs.

## VI. The Plaintiffs' Claim in the Bahamas

In March 1999, Mr. Hasson transferred $6,324,000.00 to E.P. Toothe, as trustee of a bank account, in the Bahamas. Out of those funds, $2,500,000.00 was subsequently transferred to an account in the name of Reading Management Ltd. at Bear Stearns Securities Corp. in Palm Beach County. The funds transferred to the Bahamas were derived from the sale by Mr. Hasson of his Jetstar aircraft, a parcel of real estate on Big Pine Key, and three boats. In March 2000, Mr. Johnson commenced an action in the Bahamas against Mr. Hasson and Reading Management for the recovery of the funds remaining in the possession of E.P. Toothe. On February 24, 2003, the parties to the Bahamian action reached a settlement. After the deduction of payments to the Hasson children, the payment of bank charges, and a holdback of $150,000.00 for trustee's fees, $2,787,302.45 was paid to the plaintiffs, of which $178,867.36 was paid to Mr. Johnson's Bahamian attorneys, for a net payment of $2,608,435.09 to Mr. Johnson. On March 30, 2004, $147,082.09 was paid to the plaintiffs out of the funds held back for the payment of trustee's fees, of which $19,241.97 was applied to the plaintiffs' attorneys' fees. In total, the plaintiffs received $2,736,275.21 as a result of the litigation in the Bahamas.

## VII. Total Recovery by the Plaintiffs

The total amount recovered by the plaintiffs to date in their claims against Mr. Hasson and related persons and entities is $39,288,079.15, as detailed below:

The plaintiffs' recoveries through December 31, 2001:

| Date | Source | Amount Available | Amount Recovered |
|------|--------|------------------|------------------|
| 08/06/99 | Harry Speiser settlement | | $ 10,000.00 |
| 06/20/00 | Malham account seizure | | $ 25,476.16 |
| 09/02/00 | Scott Colton | | $ 75,000.00 |
| 09/14/00 | North Palm Beach Aquatic Foundation | | $ 4,945.00 |
| 10/17/00 | Blake, execution of Mako boat | | $ 5,690.39 |
| 10/24/00 | Darla Simons | | $ 5,000.00 |
| 02/06/01 | Leopold Woolf settlement | | $ 25,000.00 |
| 02/08/01 | First Union garnishment, Hasson & Sons | | $ 735.64 |
| 03/23/01 | James Speiser, execution of home | | $ 45,016.32 |
| 03/28/01 | First Union garnishment, Treasure Coast | | $ 26,158.00 |
| 04/16/01 | Cromwell et al. settlement | | $ 285,000.00 |
| 05/08/01 | Sharon Eaton settlement | | $ 12,000.00 |
| 05/09/01 | Luther Jeffries settlement | | $ 82,000.00 |
| 06/01/01 | Atterbury et al. settlement | | $ 32,000.00 |
| 06/12/01 | Robertsons settlement | | $ 649,801.32 |
| 06/26/01 | Norbert Gartmann settlement | | $ 4,783.20 |
| 07/02/01 | Cindy Lehman settlement | | $ 5,000.00 |
| 07/17/01 | Chet Weinbaum settlement | | $ 12,000.00 |
| 07/27/01 | Kimaree Hasson settlement | | $ 5,000.00 |
| 08/14/01 | Kyle and Ryan Hasson trusts | | $ 54,736.42 |
| 08/14/01 | Aaron Patrick settlement | | $ 25,000.00 |
| 11/13/01 | Blake, Tiffany, and Kimaree Hasson trusts | | $ 19,191.00 |

The plaintiffs' recoveries after December 31, 2001:

| Date | Source | Amount Available | Amount Recovered |
|------|--------|------------------|------------------|
| 04/16/02 | William Cross settlement | $ 170,022.10 | $ 50,000.00 |
| 02/24/03 | Bahamas settlement | $ 3,824,660.00 | $ 2,787,302.45 |
| 05/14/03 | Scott Colton settlement | $ 97,588.57 | $ 28,000.00 |
| 02/17/04 | Jack Hasson, criminal restitution | $13,976,605.63 | $13,976,605.63 |
| 03/30/04 | Bahamas escrow payment | see above | $ 147,082.09 |
| 08/30/04 | Boyes & Farina settlement | $ 233,325.31 | $ 50,000.00 |
| 11/18/04 | Suzanne Hopkins judgment | $ 900,000.00 | $ 475,143.22 |

| 06/22/05 | Wachovia garnishment, Jack Hasson | not known[6] | $ 18,050.60 |
| 11/16/05 | Paris Discount Bank funds | $20,346,361.71 | $20,346,361.71 |
| | Total Received | | $39,288,079.15 |

## VIII. The Present Litigation

The motions currently pending before the court involve two of the three complaints the plaintiffs have filed in this court related to the losses they suffered at the hands of Mr. Hasson.[7] On December 10, 2003, the plaintiffs filed a complaint in Case No. 03–2803, which was amended on December 12, 2005. In this complaint, the plaintiffs argue that they were entitled to a theft loss deduction for the 1998 tax year, which would allow them a refund of $1,404,549.00 in taxes paid for 1998 and a net operating loss carryback to previous years. In the alternative, the plaintiffs assert that a theft loss deduction would have been proper in 1997, which would allow them a refund of $17,221,078.00 in taxes paid for that year.

On December 7, 2005, the plaintiffs filed a complaint in Case No. 05–1265, seeking, in the alternative, theft loss deductions in 1999, 2000, or 2001. The plaintiffs assert that, if neither 1997 nor 1998 is the proper year to take a theft loss deduction, then 1999 is the proper year, and they are entitled to a refund of $50,919.00 in 1999 and a net operating loss carryback to previous years. The plaintiffs contend that if 1999 is not the proper year, then 2000 is the proper year, and they are entitled to a refund of $444,478.00 and a net operating loss carryback. Finally, the plaintiffs assert that if 2000 is not the proper year, then 2001 is the proper year, and they are entitled to a refund of $740,742.00 and a net operating loss carryback. A net operating loss carryback from any of these years (1999, 2000, 2001) would, according to the plaintiffs, entitle them to a refund for the 1996 and 1997 tax years as well.

Following the court's 2006 decision in *Johnson I,* which dealt with Cases No. 03–2803 and 05–1265, the parties agreed to file cross-motions for summary judgment in an effort to determine the appropriate year for the plaintiffs to take a theft loss deduction. The plaintiffs filed a motion for summary judgment on June 20, 2007, and the government filed a cross-motion for summary judgment on August 17, 2007. Oral argument was held on December 17, 2007.

## DISCUSSION

### I. Standard of Review

The parties have filed cross-motions for summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court's role is not to "weigh the evidence and deter-

6. The plaintiffs assert that neither they nor anyone else was aware of this Wachovia account until 2005. The account, in the name of "Jack Hasson Agency" for the "Trustee of Living Trust dated 12/7/95 Investment Advisory Account," held the proceeds of a class action settlement in which Mr. Hasson was a claimant. Once the plaintiffs were made aware of the account, they immediately initiated legal action to garnish the account. However, the plaintiffs contend that they were reasonably certain in 2001 that they would not recover the $18,050.60 held in the account because they were not aware of the account's existence in 2001.

7. The plaintiffs filed a complaint on July 25, 2001, Case No. 01–428, seeking a tax refund in the amount of $613,669.00 for the tax year 1994, a tax refund in the amount of $121,635.00 for the tax year 1995, and a capital loss carryforward as of the end of 1995 in the amount of $191,066.00, all in an effort to recover taxes paid by the plaintiffs as a result of the capital gains they reported on their 1994 tax return from the alleged gem sales that did not actually occur. The government filed a motion for summary judgment, which the court denied on September 27, 2007 in *Johnson II,* as discussed *supra.*

mine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505. The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact; once this burden is met, in order to defeat summary judgment, the non-moving party must present evidence which demonstrates such a genuine issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Long Island Sav. Bank, FSB v. United States,* 503 F.3d 1234, 1244 (Fed.Cir. 2007).

In determining whether a genuine issue of material fact exists, the court must consider the evidence and resolve all doubts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Am. Pelagic Fishing Co. v. United States,* 379 F.3d 1363, 1371 (Fed.Cir.2004). A dispute of material fact is genuine "if the evidence is such that a reasonable finder of fact could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. Cross-motions for summary judgment do not constitute an admission that no genuine issues of material fact remain. *See Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir. 1997). "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." *Id.* (citations omitted).

The standard of review for a motion for summary judgment premised on the proper interpretation of a regulation is well-settled. Where, as here, all of the parties' factual assertions are taken as true, summary judgment on the legal issue is appropriate. *See, e.g., Santa Fe Pacific R. Co. v. United States,* 294 F.3d 1336, 1340 (Fed.Cir.2002) ("Issues of statutory interpretation and other matters of law may be decided on motion for summary judgment."); *Costain Coal, Inc. v. United States,* 126 F.3d 1437, 1440 (Fed.Cir. 1997); *Reese v. United States,* 24 F.3d 228, 230 (Fed.Cir.1994).

## II. The Plaintiffs Were Entitled to Take A Theft Loss Deduction for A Portion of Their Loss Once They Had Ascertained With Reasonable Certainty That They Would Not Recover That Portion.

■ A taxpayer's ability to take a theft loss deduction is governed by Internal Revenue Code ("IRC") §§ 165(a) & (e). IRC § 165(a) generally requires a taxpayer to take "as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." IRC § 165(e), which specifically pertains to theft losses, states that "[f]or purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." Treasury Regulation ("Treas.Reg.") § 1.165–8(a)(2) further explains:

> A loss arising from theft shall be treated under section 165(a) as sustained during the taxable year in which the taxpayer discovers the loss. See section 165(e). Thus, a theft loss is not deductible under section 165(a) for the taxable year in which the theft actually occurs unless that is also the year in which the taxpayer discovers the loss. However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, see § 1.165–1(d).

Treas. Reg. § 1.165–1(d)(2), in turn, provides in relevant part:

> If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for the purposes of section 165, *until it can be ascertained with reasonable certainty whether or not such reimbursement will be received.*

(emphasis added). As this court held in *Johnson I,* the net effect of these regulations, when read together, is as follows:

> If a taxpayer does not take a theft loss deduction for the entire loss in the year of discovery, but instead has a reasonable prospect of recovering all or a portion of

the loss and thus postpones all or a portion of the theft loss deduction, then, under Treas. Reg. § 1.165–1(d)(2), the taxpayer may not take a theft loss deduction for that portion for which reimbursement may be received until the taxpayer can ascertain with reasonable certainty whether such reimbursement will in fact be received. Treas. Reg. § 1.165–1(d)(2)(i) provides that a taxpayer may ascertain with reasonable certainty whether she will be reimbursed "for example, by a settlement of the claim, by an adjudication of the claim, or by an abandonment of the claim."

74 Fed.Cl. at 363.

Here, the plaintiffs contend that they should be entitled to take a theft loss deduction in 1998, or, in the alternative, in 2001, for the losses they determined they were not likely to recover through litigation against Mr. Hasson and his associates. Notwithstanding this court's holding in *Johnson I,* the plaintiffs assert that they should be entitled to take a theft loss deduction for any portion of their loss in the year that they determined that they did not have a reasonable prospect of recovering that portion. Specifically, the plaintiffs contend that, as of December 31, 1998, they had a reasonable prospect of recovering no more than $19,919,718.00 of the loss they suffered, and accordingly should be entitled to a theft loss deduction of $58,240,691.00 for the 1998 tax year. Alternatively, the plaintiffs assert that, by December 31, 2001, many of the plaintiffs' claims against Mr. Hasson and his associates had been settled, resolved by judgment, or abandoned, and that the plaintiffs are therefore entitled to a theft loss deduction in 2001 for the portions of the loss for which they were no longer pursuing recovery. Specifically, the plaintiffs contend that, as of December 31, 2001, they had a reasonable prospect of recovering no more than $19,202,201.61 of the loss they suffered, and accordingly should be entitled to a theft loss deduction of $57,562,744.75 for the 2001 tax year. The plaintiffs further assert that, if the court determines that the plaintiffs had a reasonable prospect of recovering the funds

held in Paris in 2001, the plaintiffs should still be entitled to a theft loss deduction in 2001 of $37,216,383.04.[8]

The government argues that the plaintiffs were not entitled to a theft loss deduction in any amount in either 1998 or 2001 but instead that the plaintiffs were entitled to a theft loss deduction in the year in which all of their claims for reimbursement were resolved. The government contends that the plaintiffs cannot claim a theft loss deduction in 1998 because none of their claims for reimbursement were resolved at that time. In addition, the government argues that because the plaintiffs were still pursuing some claims for reimbursement after 2001, and could not ascertain with reasonable certainty the total amount that they would ultimately recover, as a matter of law the plaintiffs could not take a theft loss deduction for any portion of their loss in 2001. Instead, the government asserts that the plaintiffs were not entitled to a theft loss deduction until, at the earliest, 2005, when the plaintiffs' last recovery efforts had concluded.

Neither of the positions asserted by the parties in this dispute is entirely accurate given the court's holding in *Johnson I.* The plaintiffs' continued reliance on the "reasonable prospect of recovery" standard is misplaced. This court has held, under its interpretation of the IRC and related Treasury Regulations in *Johnson I,* that the "reasonable prospect of recovery" standard is only applicable in the year a taxpayer discovers a theft loss. As Treas. Reg. § 1.165–1(d)(2) states, if *"in the year of such casualty or event,* there exists a claim for reimbursement to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained … *until it can be ascertained with reasonable certainty whether or not such reimbursement will be received."* (emphasis added). In the year the plaintiffs discovered the theft loss, 1997, the plaintiffs determined that they had a reasonable prospect of recovering all or a portion of the loss

---

8. This is equal to the difference between $57,562,744.75 and $20,346,361.71, which was the amount held in the Paris account.

and elected to pursue claims against Mr. Hasson and his associates to recover their losses. Accordingly, the plaintiffs were permitted to take a theft loss deduction for a portion of their loss only once they were able to *ascertain with reasonable certainty* that they would not recover that portion of the loss. *See Johnson I*, 74 Fed.Cl. at 363 (holding that a taxpayer "may not take a theft loss deduction for that portion for which reimbursement may be received until the taxpayer can ascertain with reasonable certainty whether such reimbursement will in fact be received"). Therefore, the court will evaluate the plaintiffs' contentions by determining whether in 1998, or alternatively whether in 2001, the plaintiffs were able to ascertain with reasonable certainty whether they would recover on their claims against Mr. Hasson and his associates.[9]

Treas. Reg. § 1.165–1(d)(2)(i) states with regard to the "reasonable certainty" inquiry that "whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, or by an adjudication of the claim, or by an abandonment of the claim." "[U]nder Treas. Reg. § 1.165–1(d), the requirement that a taxpayer 'ascertain with reasonable certainty' means that a taxpayer must obtain a verifiable determination of the amount she will receive based on a resolution of the reimbursement claim before taking a theft loss deduction." *Johnson I*, 74 Fed.Cl. at 365. Therefore, if the plaintiffs can demonstrate that some or all of their claims were resolved as of a given year, in accordance with the language of and examples set forth in Treas. Reg. § 1.165–1(d), then they will be entitled to a theft loss deduction in that year for the resolved portion of their claims.

**A. As of December 31, 1998, the Plaintiffs Had Not Ascertained With Reasonable Certainty the Amount of the Theft Loss They Would Recover.**

■ The plaintiffs first argue that they were entitled to a theft loss deduction in 1998

for the portion of their claims for which they determined they had no reasonable prospect of recovery. The court has already considered this argument and held that, unless the plaintiffs could demonstrate that they ascertained with reasonable certainty, in 1998, that they would not recover a portion of their loss, the plaintiffs were not entitled to a theft loss deduction for any amount in 1998. *Johnson I*, 74 Fed.Cl. at 366. The plaintiffs have offered no additional evidence to demonstrate that, in 1998, they did anything other than "estimate" their anticipated recovery in pending litigation against Mr. Hasson and his associates. *See id.* ("By their own admission, plaintiffs state that they made an 'estimate' of the amount of recovery. Def.'s Ex. 2 at 6, 8 ('Plaintiffs state that, when they filed their claims for a refund at issue here, they *estimated* that they would recover $20 million and excluded that amount from their claim for refund. That *estimate* was a conservative *estimate* made by [lawyers and accountants] based on their experience in litigation, collection and valuation.').") (emphasis in original). In 1998, the plaintiffs were still clearly engaged in efforts to determine how best to pursue their legal claims, as demonstrated by the fact that, in 1999, the plaintiffs added forty-one additional third-party defendants to their claim against Mr. Hasson, and in 2000, the plaintiffs added fifteen additional third-party defendants. The plaintiffs did not, in 1998, ascertain with reasonable certainty whether or not reimbursement would be received with regard to any of their claims, as required by Treas. Reg. § 1.165–1(d)(2). Accordingly, the plaintiffs were not entitled to a theft loss deduction in 1998 for any portion of their loss.

**B. As of December 31, 2001, the Plaintiffs Had Ascertained With Reasonable Certainty That They Would Not Recover a Portion of the Theft Loss.**

In the alternative, the plaintiffs contend that they were entitled to a theft loss deduction in 2001 for a portion of the loss they sustained at the hands of Mr. Hasson. The

---

9. The court notes that, despite the government's assertions to the contrary, the IRC and Treasury Regulations do not preclude a taxpayer from taking deductions for portions of a theft loss in different years. *See, e.g.,* Treas. Reg. § 1.165–1(d)(2)(ii) (as discussed *infra*).

plaintiffs assert that, as of December 31, 2001, the only claims that still existed were claims for a known, fixed sum or were claims that had been abandoned. Through 2001, the plaintiffs had recovered $1,395,462.64 from Mr. Hasson and his associates, leaving them with a total unrecovered loss of $76,764,946.36. The plaintiffs maintain that, as of the end of 2001, they only had a reasonable prospect of recovering $19,202,201.61 through their remaining claims,[10] as follows:

(1) $97,588.57 from Scott Colton, in his individual capacity and as a trustee of the Scott Colton Trust, the J.A.S. Irrevocable Trust, and the Joseph C. Stein Trust;

(2) $233,325.31 from John Farina, in his individual capacity, as a trustee of the John Farina Trust, and as a representative of Boyes & Farina, P.A.;

(3) $900,000.00 from Suzanne Hopkins;

(4) $170,022.10 from William Stuart Cross, in his individual capacity and as a representative of William Stuart Cross, P.A.;

(5) $3,824,660.00 from litigation in the Bahamas; and

(6) $13,976,605.63 in forfeited funds that were held in the U.S. District Court registry.[11]

Therefore, the plaintiffs assert that they were entitled to a theft loss deduction in 2001 of $57,562,744.75.[12]

The government asserts that the plaintiffs were not entitled to a theft loss deduction for any portion of their loss in 2001 because there was "no resolution of the claim for reimbursement as the Johnsons continued in their collection efforts for at least another four years." Def.'s Reply at 10. The government contends that, because the plaintiffs could not, in 2001, definitively determine how much they would recover from their pending claims, the plaintiffs were not entitled to take any theft loss deduction in that year. The government asserts that the plain language of Treas. Reg. § 1.165–1(d)(2) supports its position. Treas. Reg. § 1.165–1(d)(2) states that "*no portion of the loss* with respect to which reimbursement may be received is sustained ... until it can be ascertained with reasonable certainty whether or not such reimbursement will be received." (emphasis added). The government reads the phrase "no portion of the loss" to mean that the regulation requires that a taxpayer refrain from taking *any portion* of a theft loss deduction until the taxpayer has determined exactly how much of the entire loss the taxpayer will recover. In the case of the plaintiffs, the government contends that Treas. Reg. § 1.165–1(d)(2) requires that the plaintiffs take a theft loss deduction in 2005, the year in which they knew, with certainty, how much of their loss they would recover.

While, as discussed above, the plaintiffs' reliance on the "reasonable prospect of recovery" standard is not appropriate, the court generally agrees with the plaintiffs that they were entitled to a theft loss deduction for a portion of their loss in 2001. The plaintiffs have demonstrated, and the government does not dispute, that many of the

---

10. The plaintiffs ultimately recovered $17,514,133.39 as a result of these claims.

11. As of 2001, the plaintiffs also had pending claims against numerous other individuals. The plaintiffs assert that, although not dismissed until 2003, their claims against Mr. Hasson's children and their trusts were resolved by the end of 2001, as judgments had been entered in the impleader claims against the trusts at that time, and no other assets remained to be collected. The plaintiffs also assert that, although not dismissed until 2002, their claim against James Speiser was worthless after 2001 because they had received the proceeds from the sale of Mr. Speiser's sole assets in 2001. Furthermore, the plaintiffs contend that their claims against Clifford Sloan, Robert Hinton, and Barbara Hasson, although not dismissed until 2002 and 2003, held no value because Mr. Sloan, Mr. Hinton, and Ms. Hasson had no assets that could be collected by the plaintiffs. Finally, the plaintiffs maintain that their claim against Mindy Romer was brought solely to assert a superior claim to the assets Ms. Romer was seeking in post-divorce proceedings from Mr. Hasson and did not seek the recovery of any funds. Accordingly, the plaintiffs contend that none of the above claims offered any prospect of recovery to the plaintiffs after 2001. The court agrees with the plaintiffs.

12. In 2001, the plaintiffs also had a pending claim in France seeking $20,346,361.71 in funds held at the Paris Discount Bank. The plaintiffs contend that enforcement of their judgment against Mr. Hasson in France would have been nearly impossible, so they argue that, in 2001, they had no prospect of recovering the funds in France.

plaintiffs' claims against Mr. Hasson and his associates were resolved by the end of 2001, either through settlement, adjudication, or abandonment, and that the plaintiffs' remaining claims were seeking fixed and identifiable amounts. The government's reading of Treas. Reg. § 1.165–1(d)(2) is not supported by the examples contained in Treas. Reg. § 1.165–1(d)(2)(ii). Specifically, the following example is particularly relevant to the plaintiffs' case:

> If in the year of the casualty or other event a portion of the loss is not covered by a claim of reimbursement with respect to which there is a reasonable prospect of recovery, then such portion of the loss is sustained during the taxable year in which the casualty or other event occurs. For example ... if the taxpayer's automobile is completely destroyed in 1961 as a result of the negligence of another person and there exists a reasonable prospect of recovery on a claim for the full value of the automobile against such person, the taxpayer does not sustain any loss until the taxable year in which the claim is adjudicated or otherwise settled. If the automobile had an adjusted basis of $5,000 and the taxpayer secures a judgment of $4,000 in 1962, $1,000 is deductible for the taxable year 1962. If in 1963 *it becomes reasonably certain* that only $3,500 can ever be collected on such judgment, $500 is deductible for the taxable year 1963.

Treas. Reg. § 1.165–1(d)(2)(ii) (emphasis added). Under this example, once a taxpayer has secured a judgment, if the taxpayer ascertains with reasonable certainty that he or she will only recover a portion of the amount secured by the judgment, the taxpayer may, at that time, take a theft loss deduction for the portion of the loss he or she will not recover.

■ The government asserts that the plaintiffs were required by the regulations to wait until 2005 to take a theft loss deduction, because it was not until that time that the total amount the plaintiffs would actually recover was determined. However, contrary to the government's contention, the plaintiffs were not required to wait until the total amount of recovery from every source was

established to take a theft loss deduction for a portion of their loss. The above-quoted example from the regulations does not support the government's position. In the example, the taxpayer was able to take a deduction in the year the taxpayer secured a judgment for the amount of the loss not included in the judgment, and was able to take another deduction in a subsequent year once the taxpayer determined, with reasonable certainty, that the entire amount of the judgment would not be collected. The regulation and the example therefore confirm the plaintiffs' contention that once a "portion" of the recovery was established, they were entitled to take a theft loss deduction for the "portion" that they were reasonably certain they would not recover.

■ The plaintiffs in this case have established with reasonable certainty that portions of their loss would not be recovered. As of the end of 2001, the plaintiffs' remaining claims against Mr. Hasson and his associates were valued, at most, at $39,548,563.32 (the sum of the plaintiffs' claims in the United States and the Bahamas and the value of the bank account in France). After December 31, 2001, the plaintiffs could have potentially received the following:

(1) $97,588.57 from Scott Colton, which was the total amount remaining in Mr. Colton's accounts after the government's seizures;

(2) $233,325.31 from John Farina, which was the difference between the total amount received by Mr. Farina and his law firm from Mr. Hasson and the total amount seized by the government;

(3) $900,000.00 from Suzanne Hopkins, the total amount of the impleader claim filed against her;

(4) $170,022.10 from William Stuart Cross, which was the total amount of funds that Mr. Cross had improperly diverted that the plaintiffs were eligible to receive per the U.S. District Court's order in the Hasson criminal trial;

(5) $3,824,660.00, the total amount of funds held in the Bahamas;

(6) $13,976,605.63, the total amount of funds available to the plaintiffs in the U.S. District Court registry; and

(7) $20,346,361.71, the total amount of funds held in France.

The plaintiffs assert that they never anticipated recovering the funds from the bank account in France, claiming that the United States and France do not have a treaty in place regarding the enforcement of American civil judgments, and that the test for the enforcement of judgments by France is difficult to satisfy. The plaintiffs state that "there was a low likelihood" of ever recovering the funds from France. Pls.' Mot. for Summ. J. at 10. However, the plaintiffs continued to pursue their claim in France, and ultimately, in 2005, recovered $20,346,361.71 from the bank account there. While the plaintiffs might have doubted their ability to enforce their judgment against Mr. Hasson in France, the plaintiffs did not ascertain with reasonable certainty by the end of 2001 that they would not recover the money held there, and the plaintiffs concede that they continued to pursue their claim in France until they ultimately recovered on the judgment in 2005. *See* Oral Arg. Tr. 26:20–25, Dec. 17, 2007. Accordingly, the value of the bank account in France may not be included in the plaintiffs' theft loss deduction for 2001.

In 2001, both the government's attorneys and the U.S. District Court made a determination that no additional assets had been identified from which the plaintiffs could recover and estimated the maximum total amount the plaintiffs would ever recover to be approximately $40,000,000.00. The U.S. District Court, relying on a motion made by the United States, stated, "[n]o additional assets owned and/or controlled by the defendant John Hasson have been identified or are accessible. Accordingly, the total known assets of defendant John Hasson are insufficient to pay the amount of restitution ordered by this Court." Pls.' Ex. 34 at 4–5.

In light of this undisputed evidence, the plaintiffs had ascertained with reasonable certainty in 2001 that they had no prospect of recovering $37,216,383.04. Accordingly, the plaintiffs were entitled, in 2001, to a theft loss deduction in that amount. Under the above holding, the plaintiffs are entitled to theft loss deductions in subsequent years for the amounts they ultimately did not recover on the claims that were pending as of the end of 2001. The plaintiffs also have remaining claims related to a net operating loss carryback from the 2001 tax year, and from subsequent tax years. The parties shall file a joint status report proposing the next steps for resolving the remaining issues in this portion of the litigation.

## CONCLUSION

For all of the foregoing reasons, the plaintiffs' motion for summary judgment is **GRANTED–IN–PART** and **DENIED–IN–PART,** and the government's cross-motion for summary judgment is **GRANTED–IN–PART** and **DENIED–IN–PART.** The parties shall file a joint status report by **Monday, February 4, 2008,** as detailed above. In the joint status report, the parties shall also propose the next steps for resolving the remaining issues in Case No. 01–428T.

**IT IS SO ORDERED.**